IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

DAWN DAUGHERTY,

                Plaintiff,

v.                                                    CIV. No.  98-1573 JP/LFG

WILLIAM RICHARDSON, SECRETARY,
UNITED STATES DEPARTMENT
OF ENERGY,

                Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>

On April 14, 2000, Defendant William Richardson, Secretary of the U.S. Department of

Energy, filed a Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc.

No. 39) and a Motion for Partial Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) or, in the

Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No.

37).  After a careful review of the briefs and the relevant law, I have determined that the motion

for partial summary judgment (Doc. No. 39) should be denied.  The motion for partial dismissal

or for partial summary judgment (Doc. No. 37) should be granted in part and denied in part.

I.       LEGAL STANDARD

Defendant's motion for partial dismissal under Federal Rule of Civil Procedure 12(b)(6)

or, in the alternative, for partial summary judgment under Rule 56(c) will be considered as a

motion made under Rule 56.  Under the Federal Rules, if a court refers to material extraneous to the parties' pleadings in deciding a Rule 12(b)(6) motion, the motion is converted into a motion for summary judgment.  Here, both the Defendant and Plaintiff have submitted voluminous exhibits in support of their positions which the Court has taken into account.  The parties discussed in detail much of this evidence during the pretrial conference held on June 20, 2000.  Therefore, this Court will treat Defendant's motion as a motion for partial summary judgment under Rule 56(c).

A court should grant summary judgment only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Supreme Court has observed that a genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Initially, the moving party carries the burden of establishing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the party opposing the motion, who must come forward with evidence, beyond mere allegations or denials of the pleadings, which shows that a genuine issue of material fact exists.  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  In deciding a motion for summary judgment, courts should "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc*, 912 F.2d 1238, 1241 (10th Cir. 1990).

II.     BACKGROUND

In January 1995, Dawn Daugherty, the Plaintiff, began working for the United States

Department of Energy ("DOE") in Los Alamos, New Mexico.  Plaintiff held the position of

project manager, and her responsibilities included monitoring the costs of construction programs

at the Los Alamos National Laboratory ("LANL").  In October 1996, Herman Le-Doux became

Plaintiff's direct-line supervisor.  From October 1996 to May 1998, the period during which Mr.

Le-Doux supervised Plaintiff, a series of conflicts developed between the two.  Plaintiff alleges

that Mr. Le-Doux subjected her to numerous unfavorable employment decisions, and that sex

discrimination and retaliation motivated these decisions.  Defendant contends that to the extent

that Plaintiff received negative treatment, this treatment was attributable not to discrimination but

rather to Plaintiff's aggressive work style and poor interpersonal skills.

   Plaintiff maintains that the events that are the subject of this lawsuit began in October

1996.  At that time, Mr. Le-Doux created a "team leader" position in the project management

group.  Mr. LeDoux appointed Gilberto Valenzuela, a coworker of Plaintiff's, to the temporary

position of Acting Team Leader.  Plaintiff asked Mr. Le-Doux if she could serve as Acting Team

Leader after Mr. Valenzuela's temporary assignment expired.  Mr. Le-Doux denied Plaintiff's

request and decided to have Mr. Valenzuela continue in the position of Acting Team Leader.  On

April 30, 1997, Plaintiff sought counseling with an Equal Employment Opportunity ("EEO")

counselor at the DOE and alleged, inter alia, that Mr. Le-Doux had discriminated against her on

the basis of sex by refusing to allow her to act as temporary Acting Team Leader.

   Plaintiff contends that sometime between Plaintiff's April 30, 1997 meeting with an EEO

counselor and May 14, 1997, the counselor told Mr. Le-Doux of Plaintiff's reports of

discrimination.  According to Plaintiff, Mr. Le-Doux then started to engage in a pattern of

retaliatory acts against Plaintiff, and these acts of reprisal included efforts to improperly lower

Plaintiff's job performance rating.  The DOE appraisal system involves a "360 degree evaluation," through which employees receive critiques from a number of supervisors, peers, co-workers and customers.  Plaintiff maintains that in June 1997, Mr. Le-Doux adjusted the composition of Plaintiff's evaluation team, adding individuals known to dislike Plaintiff, in order to skew her scores.  Later, when it was time for Mr. Le-Doux to contribute his 360 degree evaluation ratings, as Plaintiff's supervisor, he gave her low scores.  As a result, Plaintiff alleges, she received an undeservedly poor evaluation which has damaged her subsequent chances for promotions.

In May 1997, Plaintiff drafted a memorandum to a LANL employee requesting information about the Laboratory's relationship with Fluor-Daniel, an architectural engineering firm.  Plaintiff noted in the memorandum that LANL might be planning to task non-nuclear work to Fluor-Daniel and that Fluor-Daniel's rates were higher than those of other architectural engineering firms.  In June 1997, Plaintiff forwarded the memorandum to her team leader, Mr. Valenzuela, for his signature.  Mr. Valenzuela declined to sign the memorandum.  He was concerned that Plaintiff had a potential conflict of interest in the matter, because her husband worked for a competitor of Fluor-Daniel's.  Mr. Valenzuela turned over the draft of the memorandum to Mr. Le-Doux.

Plaintiff alleges that Mr. Le-Doux misinformed Tom Todd, the area manager of the Los Alamos DOE office, that Plaintiff had written the memorandum in an attempt to steer work toward her husband's employer.  As a result, Mr. Todd directed Mr. Le-Doux to issue a letter to Plaintiff informing her that she may have breached conflict of interest guidelines, and warning her that she might be disciplined for future violations of conflict of interest policy.  Plaintiff argues Mr. Le-Doux mischaracterized Plaintiff's actions, and that this mischaracterization was

4

retaliatory.  On August 22, 1997, Plaintiff filed a complaint of sex discrimination and retaliatory

discrimination with the EEO, citing Mr. Le-Doux's changing of the composition of her 360

degree evaluation team and his issuance of the conflict of interest letter.

In August 1997, a selection team which included Mr. Le-Doux reached a decision about

which candidate to choose for the position of permanent Team Leader.  The team declined to

select Plaintiff, and instead chose Mr. Valenzuela, who had held the position of Acting Team

Leader since the previous October.  On September 15, 1997, Plaintiff filed another complaint of

sex discrimination and retaliation, in response to her failure to be selected permanent Team

Leader.

Around October, 1997, Plaintiff reported to Mr. Le-Doux that she was having trouble

obtaining information that she had requested from a LANL employee, Ross Garcia.  Plaintiff told

Mr. Le-Doux that she believed that Mr. Garcia was discriminating against her on the basis of sex.

On October 16, 1997, Plaintiff, Mr. Le-Doux, Mr. Garcia, and others held a meeting to discuss

Plaintiff's allegations.  Plaintiff contends that Mr. Le-Doux failed to support her at this meeting.

Instead he made clear at the meeting that he thought that the source of Plaintiff's problems was

not gender discrimination, but rather her aggressive personality.  On December 17, 1997, Plaintiff

filed an EEO complaint over Mr. Le-Doux's alleged conduct at this meeting.

On January 15, 1998, Mr. Le-Doux proposed that Plaintiff be suspended.  As bases for the

proposed suspension, Mr. Le-Doux cited a number of reasons, including Plaintiff's resistence to

Mr. Le-Doux's efforts to help her improve her interpersonal skills and an incident in which

Plaintiff told two co-workers that she wanted Mr. Le-Doux to be fired and that she would

undermine her own projects to make him look bad.  The final decision about the suspension rested

with Mr. Todd.  In between the time that Mr. Le-Doux proposed the suspension and the time that Mr. Todd made his decision, Mr. Todd learned that Plaintiff wanted to transfer to the Albuquerque office of the DOE.  A supervisor in Albuquerque, Patricia O'Guin, was willing to take on Plaintiff as an employee.  Mr. Todd told Plaintiff that he would support her transfer to Albuquerque, and drop the suspension that he was considering, if she would agree to stop pursuing her EEO charges.  Plaintiff refused to dismiss her pending EEO claims.  In March, 1998, Mr. Todd imposed the five-day suspension on Plaintiff.

On December 28, 1998, Plaintiff filed her Complaint, which contains two counts.  Count I alleges that Defendant discriminated against Plaintiff on the basis of sex in violation of Title VII.  Count II alleges that Defendant retaliated against her in violation of Title VII for having brought charges of discrimination.  One motion for summary judgment focuses on Plaintiff's assertions of discrimination and retaliation regarding her five-day suspension.  The other motion focuses on Plaintiff's assertions of discrimination and retaliation with respect to other employment decisions.

III.   DISCUSSION

A.   Defendant's Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No. 39)

Defendant directs this motion at Plaintiff's allegation that her five-day suspension was motivated by retaliatory discrimination and sex discrimination.[1]

---

[1]   In her Complaint, Plaintiff alleges that the suspension was retaliatory, but does not explicitly allege that the suspension was discriminatory.  However, it is clear from Plaintiff's briefs that she intends to assert that sex discrimination motivated Defendant's decision to suspend her. Defendant assumes in his briefs that Plaintiff is alleging sex discrimination in  addition to retaliation.  Therefore, this Court evaluates Plaintiff's claim that the suspension was discriminatory, as well as retaliatory, in deciding Defendant's motion for summary judgment.

      1.    <u>Retaliation</u>

The burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973),

applies to retaliatory discrimination claims brought under Title VII. *Pastran v. K-Mart Corp.*,

210 F.3d 1201, 1205 (10th Cir. 2000). Plaintiffs must first set forth a prima facie case of

retaliation, by showing that "(1) he or she was engaged in opposition to Title VII discrimination;

(2) he or she was subjected to adverse employment action subsequent to or contemporaneous

with the protected activity; and (3) there is a causal connection between the protected activity and

the adverse employment action." *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262-63

(10th Cir. 1990). If the plaintiff satisfies these elements, the burden shifts to the defendant to

provide a legitimate, non-discriminatory explanation for the adverse employment action. *Pastran*,

210 F.3d at 1206. If the defendant succeeds, "[t]he plaintiff then bears the ultimate burden of

demonstrating that the defendant's proffered reason is pretextual." *Id*.

      a.    <u>Prima Facie Retaliation Claim</u>

Defendant does not appear to challenge, and it seems clear, that Plaintiff meets the first

two requirements for a prima facie case of retaliatory discrimination under Title VII. By March

27, 1998, when Mr. Todd issued the Notice of Suspension, Plaintiff had engaged in protected

activity. She had filed at least three EEO complaints and had informed Mr. Todd that she

intended to continue pursuing her pending claims. Hence Plaintiff satisfies the first prong of the

test. The disciplinary measure at issue, a suspension without pay, constitutes an adverse

employment action under Tenth Circuit law. See, e.g., *Roberts v. Roadway Express., Inc.*, 149

F.3d 1098, 1104 (10th Cir. 1998).

Defendant asserts that there was no causal connection between Plaintiff's protected

activity and the adverse employment action that she suffered.  In Title VII retaliation cases, "[t]he causal connection may be shown by producing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999).  Here, the circumstances surrounding Plaintiff's suspension, and the sequence of events, support an inference of retaliation.

Around February, 1998, between the time that Mr. Le-Doux proposed Plaintiff's suspension and the time that Mr. Todd made a final decision about the suspension, Plaintiff told Mr. Todd that she was interested in transferring to the Albuquerque office, to work for Patricia O'Guin.  Mr. Todd responded that he would support her move, and not proceed with the proposed suspension, if Plaintiff stopped pursuing her EEO claims.  (Dep. of Tom Todd at 267, Pl.'s Ex. 27).  Plaintiff refused to drop her EEO charges.  On March 27, 1998, Mr. Todd suspended Plaintiff for one week.  (Notice of Decision to Suspend, Def.'s Exh. L).  Mr. Todd's imposition of the suspension after Plaintiff's refusal to dismiss her EEO charges creates an inference of a retaliatory motive.  Plaintiff satisfies the causation prong of a prima facie retaliation case.

> b.    Legitimate Non-discriminatory Explanation

Defendant's brief details numerous instances in which Plaintiff exhibited deficiencies in her interpersonal skills.  She showed disrespect toward her superiors and displayed a sarcastic, aggressive attitude.  Plaintiff admits, in her response, that "Defendant has set forth a reason for the suspension that, on its face, is not discriminatory."  (Plaintiff's Response to Defendant's Motion for Partial Summary Judgment (Doc. No. 47) at 4).  This Court therefore considers Defendant to have satisfied the second stage of the *McDonnell Douglas* framework.

c.      Pretext

Because Defendant has established a legitimate reason for Plaintiff's suspension, the

burden moves back to Plaintiff to demonstrate that the Defendant's explanation is pretextual.

Plaintiffs bringing Title VII retaliation claims "can prove pretext by 'showing either that a

discriminatory reason more likely motivated the employer or that the employer's proffered

explanation is unworthy of credence.'"  *Cisneros v. Wilson*, 226 F.3d 1113, 1133 (10th Cir.

2000), quoting *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1208 (10th Cir. 1999).  Here,

Plaintiff has shown several circumstances which raise questions about the Defendant's stated

reasons for Plaintiff's suspension.

First, Plaintiff points to indications that Mr. Todd may not have believed that Plaintiff's

behavior was so egregious as to warrant discipline.  By December 1997, Mr. Todd knew of all of

Plaintiff's conduct that he later listed in the Notice of Suspension as warranting discipline.  He

was aware, for example, of Plaintiff's alleged refusal to accept her position as building manager

and of Plaintiff's statements to Mr. Nunz and Mr. Murnane that she wanted to get Mr. Le-Doux

fired.  However, Mr. Todd has testified that he had not considered disciplining Plaintiff for these

incidents until Mr. Le-Doux proposed Plaintiff's suspension.

Second, Mr. Todd does not seem to have perceived Plaintiff's problems at work as

stemming entirely from her negative attitude and aggressive style.  In February, 1998, Mr. Todd

and Ms. O'Guin discussed, over several conversations, the possibility of transferring Plaintiff to

the Albuquerque office of the DOE.  Mr. Todd remarked to Ms. O'Guin that he could not

determine whether it was Mr. Le-Doux or Plaintiff who was the source of the conflict between

the two.[2]  (Dep. of Patricia O'Guin at 31, Pl.'s Ex. 27).

Third, Mr. Todd has testified that until Plaintiff insisted that she would not drop her EEO charges, he had been "very hopeful that we could find some resolution here outside of the recommended course of action, which was the five-day suspension."  (Dep. of Tom Todd. at 269, Pl.'s Ex. 29).  This statement underscores that Plaintiff's resistance toward dropping her EEO claims seems to have played a role in Mr. Todd's decision to discipline Plaintiff.[3]

Taken together, these factors support Plaintiff's argument that Defendant's proffered explanation for the five-day suspension is pretextual.  Plaintiff has satisfied her burden under the third stage of the McDonnell Douglas test.  Summary judgment is therefore not appropriate.

    2.    <u>Disparate Treatment</u>

    a.    <u>Prima Facie Case of Disparate Treatment</u>

While the burden-shifting scheme is the same in Title VII disparate treatment cases as it is in retaliation cases, the elements of a prima facie case are different.  Citing *Texas Dep't of*

---

[2]    This Court finds the Defendant's characterization of this evidence puzzling. Defendant calls Ms. O'Guin's sworn deposition testimony "obviously hearsay, self-serving and inadmissible."  (Defendant's Reply to Plaintiff's Response to Defendant's Motion for Partial Summary Judgment (Doc. 54) at 7).  Under Fed. R. Evid. 801, admissions by party-opponents are not hearsay at all.  Admissions include "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).  Mr. Todd's statement, made in his capacity as a DOE manager dealing with personnel issues, falls within this definition.  Defendant does not explain why Ms. O'Guin's report of Mr. Todd's comments is "self-serving."  Ms. O'Guin is not a party in this case.  To the extent that Defendant wishes to argue that Ms. O'Guin is biased, this would be a question of weight, not admissibility.

[3]    Defendant argues that Mr. Todd's proposal represented a legitimate effort to settle Plaintiff's discrimination claims.  However, Plaintiff has pointed to circumstances which suggest that Mr. Todd had not been inclined to administer the suspension before Plaintiff refused to drop her discrimination charges.

*Community Affairs v. Burdine*, 450 U.S. 248, 253-56 (1981) and *McDonnell-Douglas*, Defendant states that Plaintiff must articulate a prima facie case of disparate treatment discrimination by showing "first, she is a member of a protected group; second, she was adversely affected in the terms and conditions of her employment; and, third, she was treated differently than men under similar circumstances."[4]  (Def.'s Memorandum of Law in Support of Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No. 40) at 4.)

In his initial brief, Defendant does not seem to contest that Plaintiff has satisfied the elements of a prima facie case of disparate treatment discrimination.  Defendant instead focuses on the argument that there was a legitimate, non-discriminatory reason for the suspension of Plaintiff.  In his reply brief, though, Defendant appears to assert that the Plaintiff fails to satisfy the third element of a prima facie claim of disparate disciplinary treatment, because she does not show that she received different treatment than similarly situated employees not belonging to her protected group.

As Defendant raised this argument only in his reply brief, Plaintiff did not have the opportunity to address this issue directly in her response.  However, in Plaintiff's Statement of Uncontroverted Facts, she asserts that two male coworkers, Mr. Murnane and Mr. Nunz, had

---

[4]     Recent Tenth Circuit cases cast doubt on whether a plaintiff is *required* to show that the employer administered discipline differently to people outside of her protected group, in order to state a prima facie case.  Instead, this may be just one way to set forth a case.  See *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 fn. 6 (10th Cir. 2000) ("Nothing in the case law in this circuit requires a plaintiff to compare herself to similarly-situated co-workers to satisfy the fourth element of her prima facie case.  A plaintiff alleging discrimination in violation of Title VII can satisfy the fourth element of her prima facie case in a number of ways.") See also *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000).
        These clarifications of the law have no impact in this case, however, because this Court finds that Plaintiff has shown differential treatment of similarly-situated employees.

styles similar to hers and had similar problems interacting with LANL employees.  These men never received suspensions, Plaintiff observes, nor were they subjected to other disciplinary measures.  Defendant disputes Plaintiff's comparison of herself with Mr. Nunz and Mr. Murnane. Defendant points out that the Tenth Circuit has held that "similarly situated employees" are those that have the same supervisor.  Defendant argues that Plaintiff cannot compare her treatment with that of Mr. Nunz, because Mr. Nunz did not work in the project management group, and because Mr. Le-Doux was not Mr. Nunz's "first-line supervisor."  This Court is not persuaded by Defendant's argument, for two reasons.

First, Defendant fails to make clear why the relevant comparison on the issue of Plaintiff's suspension is only between those employees who share a common *first-line* supervisor. Defendant emphasizes elsewhere that Mr. Todd, in addition to Mr. Le-Doux, played an important role in the decision to suspend Ms. Daugherty.[5]  Under these circumstances, the class of similarly situated employees at issue is not just those employees over whom Mr. Le-Doux exercised authority, but rather all those employees over whom Mr. Todd exercised authority.  Second, Defendant concedes that Mr. Murnane and Ms. Daugherty shared the same supervisor. Defendant does not explain why evidence about Mr. Murnane alone would be inadequate to show the employer's different treatment of another employee who exhibited the same problematic behavior as Ms. Daugherty.

Defendant further contends that Mr. Nunz and Mr. Murnane do not constitute "similarly

---

[5]     Tenth Circuit cases suggest that the reason for the "same supervisor" test is that "differences in treatment may be attributed to the fact discipline was administered by different supervisors."  *Elmore v. Capstan*, 58 F.3d 525 (10th Cir. 1995).  If, as Defendant indicates, Mr. Todd was the ultimate decisionmaker, it seems inappropriate to compare only those employees falling under Mr. Le-Doux's intermediate authority.

situated employees" because although they had styles similar to Plaintiff's they "incorporated changes into their approaches to work" and were willing to listen to criticism (Def.'s Reply at 5). Plaintiff, in contrast, resisted her superiors' suggestions for improvement. Defendant's assertion, while relevant to the discussion of non-discriminatory explanations and pretext below, cannot properly be analyzed at the prima facie stage of a discrimination claim. The Tenth Circuit has explained that "at the prima facie stage of the McDonnell Douglas analysis, a plaintiff is required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1193. The Defendant cannot use his explanation for the differential punishment of Plaintiff's aggressive behavior to defeat Plaintiff's showing of a prima facie case of discrimination.

b.      Legitimate Non-discriminatory Reason

As this Court noted above, in the context of Plaintiff's retaliation claim, Plaintiff does not dispute that Defendant has offered a legitimate explanation for suspending Plaintiff.

c.      Pretext

Plaintiff concedes that Defendant has articulated a facially non-discriminatory reason for her suspension. Plaintiff maintains, however, that this proffered reason is not the true explanation for Defendant's decision to discipline Plaintiff, but is merely pretext. A plaintiff can demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Bullington v. United Air Lines, Inc.*, 186 F.2d at 1317 (10th Cir. 1999).

Plaintiff has identified inconsistencies in Defendant's stated explanation for the suspension

13

which support Plaintiff's claim of pretext.  Contradictions emerge, for example, on the issue of the

significance of the incident  in which Plaintiff allegedly stated to Mr. Murnane and Mr. Nunz that

she wanted Mr. Le-Doux to be fired and would undermine her own projects to make Mr. Le-

Doux and Mr. Valenzuela look bad.  Although Mr. Le-Doux listed this event first when he

detailed his reasons for proposing Plainitff's suspension (See Deft.'s Exh. K, Notice of Proposed

Suspension), he indicated in his deposition testimony that Plaintiff's statements did not influence

his decision.[6]   Defendant has stressed that Mr. Todd was the ultimate decisionmaker, but this

does not render Mr. Le-Doux's role in the process irrelevant.  Plaintiff has shown that there is

some question about whether Mr. Todd would otherwise have considered the event sufficiently

serious to merit discipline.   Mr. Todd stated in his deposition that even after learning of Plaintiff's

angry comments about Mr. Le-Doux, he did not contemplate taking any disciplinary action

against Plaintiff over the incident until Mr. Le-Doux told him that he planned to propose

disciplining Plaintiff.  (Dep. of Tom Todd at 253-54, Pl.'s Ex. 25).  The fact that some

inconsistencies emerge at each level of the decisionmaking process supports Plaintiff's claim that

questions of material fact remain.

Further, at the time that Mr. Todd was considering disciplinary action against Plaintiff, he

may not have attributed the conflicts between Mr. Le-Doux and Plaintiff entirely to Plaintiff's

attitude and conduct.  Instead, in a statement to Ms. O'Guin, he implied that Mr. Le-Doux and

---

[6]        See Dep. of Herman Le-Doux, Pl.'s Ex. 43, at 292:

> The fact that she wanted to get me fired– there's probably a person or two other than her that feel the same way.  I mean, it happens with every supervisor.  I mean, that's– that's nothing that– that's new, or that's nothing that should ever be used against a person.  And I didn't use it.

Plaintiff had a personality conflict, and he could not discern which party was the source of the problem.  In contrast, in the Notice of Suspension, Mr. Todd seemed to assign blame for the problems between Plaintiff and Mr. Le-Doux solely to Plaintiff.  This apparent inconsistency weakens the credibility of Mr. Todd's stated reasons for suspending Plaintiff.

Plaintiff also argues that it is implausible that her aggressive style was the actual reason for her suspension, because two male employees with similar styles– Mr. Nunz and Mr. Murnane– were never subjected to discipline.  Defendant does not dispute that Mr. Nunz and Mr. Murnane had abrasive attitudes.  Mr. Le-Doux and Mr. Todd have stated that they viewed Mr. Nunz and Mr. Murnane as having problematic interpersonal skills.  (Dep. of Tom Todd at 195-96, Def.'s Ex. M; Dep. of Herman Le-Doux at 75, 348-49, Def.'s Ex. N).  Defendant argues, though, that Mr. Nunz and Mr. Murnane differed from Plaintiff in a significant respect.  While these men demonstrated a willingness to correct their objectionable behavior, Plaintiff refused to take note of her shortcomings or improve her interpersonal skills.  The amorphous quality of Defendant's explanation– that Plaintiff's superiors perceived a willingness to improve among some of her co-workers but not in her– makes it difficult to conclude at this stage that Plaintiff has presented no issue of material fact.  Even given Defendant's explanation for the disparity in the treatment of Plaintiff and men with similar deficiencies, inconsistencies seem to remain.

For instance, Mr. Le-Doux acknowledges that Plaintiff appeared to have complied with his instructions for improvement in at least one area.  In Defendant's brief, he lists "[t]he events leading up to Ms. Daugherty's suspension [that] clearly justify the disciplinary action."  One of these events was a meeting in which Plaintiff accused LANL employees of illegal activity, after having been advised not to do so.  Soon after this meeting, on February 4, 1997, Mr. Le-Doux

counseled Plaintiff against bringing up the matter with LANL personnel.  Mr. Le-Doux has stated that Plaintiff subsequently followed his instruction and refrained from raising the issue of illegal activity with LANL employees.  (Dep. of Herman Le-Doux at 90-91, Pl.'s Ex. 47).  On the other hand, Mr. Murnane's conflicts with Mr. Le-Doux seem to have endured for some time, despite Defendant's stance that Mr. Murnane was willing to change his abrasive style.   The incident on which Mr. Le-Doux acted "acidic" toward Mr. Murnane, which Defendant cites, took place after Plaintiff transferred from the Los Alamos office.  (Dep. of Chris Murnane at 24, Def.'s Ex. C.)

Defendant correctly observes that it is not the court's role to evaluate the wisdom of employers' disciplinary decisions.  This Court does not mean to imply, in its analysis, that Plaintiff should have been given a certain number of additional opportunities to improve her behavior, or that her male co-workers should have been given fewer opportunities to improve.  This Court merely takes note that Plaintiff and Defendant agree that there was a clear contrast in the treatment afforded Mr. Murnane and Mr. Nunz and the treatment afforded Plaintiff.  Defendant accounts for this contrast by maintaining that there was a pattern– Plaintiff resisted efforts to improve her interpersonal skills, while Mr. Murnane and Mr. Nunz were willing to change.  This Court finds that the deviations from this pattern that the record reflects diminish the plausibility of Defendant's explanation for the less favorable treatment of Plaintiff.

Therefore, Defendant's motion for summary judgment on the issue of Plaintiff's five-day suspension should be denied.

     **B.**    Defendant's Motion for Partial Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No. 37)

     Defendant directs this motion at Plaintiff's allegations that a group of employment decisions, other than the five-day suspension, also constituted retaliation, sex discrimination, or both.

     1.    Retaliation

     Plaintiffs bringing retaliation claims under Title VII must establish, as the second element of their prima facie case, that they suffered adverse employment actions from their employers. During the pretrial conference held on June 20, 2000, this Court requested that Plaintiff clarify which of the employment decisions listed in her complaint she was claiming constituted adverse employment actions, and which decisions were merely evidence of a pattern of retaliation. At the conference, Plaintiff agreed that only Plaintiff's five-day suspension and her failure to be selected permanent team leader amounted to adverse employment actions. This Court entered an Order (Doc. No. 59) limiting the retaliatory actions Plaintiff could claim to these two decisions.

     Following the pretrial conference, however, Plaintiff filed a Motion to Modify Order Regarding Adverse Employment Acts Claimed by Plaintiff (Doc. No. 61). In this motion, Plaintiff asserts that she erred in agreeing to limit her retaliation claims to those based only on the suspension and the Defendant's failure to name her team leader. Plaintiff requests that she be able to treat three additional acts as adverse employment actions. These acts are: 1) Herman Le-Doux's changing of the composition of Plaintiff's 360 degree performance evaluation team to include people he knew would rate Plaintiff unfavorably; 2) Herman Le-Doux's low scoring of Plaintiff on her 360 degree performance evaluation; and 3) Herman Le-Doux's wrongful issuance

of a conflict of interest letter.  Plaintiff says that she offered analysis in her response brief to

Defendant's motion for summary judgment that supports the classification of these three acts as

"adverse employment actions."  She provides additional case law analysis in her motion for

modification of this Court's order.

In his response to Plaintiff's motion (Doc. No. 65), Defendant states that he relies on his

arguments in his briefs in support of the motion for summary judgment.  His stance is that the only

employment decisions cited by Plaintiff that rise to the level of "adverse employment actions" are

the five-day suspension and the non-selection for the position of team leader.  Defendant does not

appear to raise any procedural challenge to Plaintiff's request for a modification after she had

agreed during the pretrial conference to limit her retaliation claims to only two adverse

employment actions.  Therefore, this Court believes that an appropriate way to resolve this matter

is to consider, as part of the Court's determination of whether Defendant is entitled to summary

judgment, whether the three additional employment decisions constitute "adverse employment

actions."

Looking again at the employment decisions at issue, this Court finds that neither of the

alleged actions relating to the 360 degree evaluations–  Mr. Le-Doux's manipulation of the

composition of the team or his low scoring of Plaintiff–  falls into the category of an "adverse

employment action," under Tenth Circuit law.  Plaintiff is correct to point out that the Tenth

Circuit employs a liberal definition of adverse employment actions.  *Berry v. Stevinson Chevrolet*,

74 F.3d 980, 986 (10th Cir. 1996).  The Tenth Circuit has declined to adopt a "materiality"

requirement, and instead "takes a case-by-case approach to determining whether a given

employment action is 'adverse.'"  *Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir.

1998).

However, as the word "adverse" connotes, it stands to reason that a Plaintiff claiming an "adverse employment action" must show that the employer imposed something unfavorable or negative. Here, Plaintiff has not established the unfavorability of her 360 degree review. Plaintiff's overall score from her 1996-97 review– the review that she asserts was tainted by retaliatory discrimination– was 7.36 out of a possible 10. (Def.'s Ex. L). Her score was only slightly higher, 7.72, in the preceding year– a period in which she does not claim any discrimination occurred. (Def.'s Ex. M). Under the rating system, a scores falling into the 7 to 9 point range is a "strength" range. On its face, Plaintiff's evaluation does not seem negative.

The facts of this case recall those in *Meredith v. Beech Aircraft*, 18 F.3d 890 (10th Cir. 1994), where the plaintiff claimed that a performance review conducted by her employer amounted to an "adverse employment action. The court observed that "[e]ven though [plainitff] categorizes the review as negative because it was lower than previous evaluations, it is undisputed she was given satisfactory marks." *Id.* at 896. Because the plaintiff had "not raised an inference the rating 'meets expectations' is a negative evaluation," the court held that she had failed to show an adverse employment action. *Id.*

In this case, the Plaintiff asserts that her slightly lower score in the 1996-97 rating did have an unfavorable effect, because a downward trend in her annual ratings has diminished her opportunities for subsequent promotions. Plaintiff does not seem to point to any admissible evidence in support of this assertion, however. She does not cite any official federal promotion criteria that significantly disfavor a candidate with a slight ratings decline in one year. She does not offer the testimony of any superior who would have given her a promotion but for her

lowered rating in one annual evaluation.  She doe not provide statistics about the relative success of obtaining promotions among DOE employees with ratings declines.  Plaintiff relies only on her own testimony that the downward trend caused by the lower evaluation in 1997 has harmed her chances for promotion.  Given the favorability, on its face, of Plaintiff's evaluation, and her lack of additional evidence showing a negative impact, this Court finds that Herman Le-Doux's decisions relating to Plaintiff's 360 degree evaluation do not rise to the level of adverse employment actions.

In contrast, this Court does find that the issuance of the conflict of interest letter, containing a warning about future discipline, constitutes an adverse employment action. Defendant argues that letter was not an adverse action, because it did not carry with it any significant change in employment status.  In fact, Tenth Circuit case law indicates that a warning letter can amount to an adverse employment action.  In *Roberts*, 149 F.3d at 1104, the plaintiff had received 20 warning letters, in addition to other forms of discipline, after filing a complaint of discrimination.  The Tenth Circuit stated,

> [a]s to the written warnings, [defendant] contends that they had no adverse effect on the terms and conditions of [plaintiff's] employment because, after a nine month term of 'validity,' they could not be sued to support disciplinary actions such as termination.  But the record indicates that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction . . . . This alone is enough to constitute adverse employment action.

In this case, as Plaintiff notes, the language of the conflict of interest letter implies that now that she has engaged in one violation of conflict of interest policy, she will be more vulnerable to

discipline if she does so again.[7]  Another Tenth Circuit case also seems to support the admissibility of such a warning letter to show a pattern of retaliation.  See *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (noting that pattern of retaliation began with plaintiff being "written up").

Beyond showing that the warning letter constituted an adverse employment action, Plaintiff has also satisfied the other elements of a prima facie case of retaliation under Title VII.  Defendants do not dispute that Plaintiff meets the first requirement– protected activity.  Plaintiff sought EEO counseling on April 30, 1997, and Herman Le-Doux acknowledges that he was aware of this when he took action concerning Plaintiff's alleged conflict of interest.  As to the third prong–  the requirement of a casual link between the protected activity and the adverse employment action–  the Tenth Circuit has held that a "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).  Although the specific dates are difficult to discern from the parties' briefs, it appears that Plaintiff sought EEO counseling on April 30, 1997, that Mr. Le-Doux had learned of this by about the middle of May, and that Mr. Le-Doux had initiated the warning process by about the middle of June. The Tenth Circuit has found this approximate range of time adequate to establish a causal link, at the prima facie stage.

As Plaintiff has set forth a prima facie case of retaliation, with regard to the warning letter, the burden shifts to Defendant to articulate a non-discriminatory reason for issuing the letter.

---

[7]     Defendant maintains that because such letters are not kept in employees' personnel files, they cannot be considered adverse employment actions.  However, the letters are kept in employees' conflict of interest files.  Thus it seems that they would have continuing influence.

Defendant has satisfied this burden.  Plaintiff's request for information from LANL related to the efficiency of Fluor-Daniel, an architectural engineering firm.  Because Plaintiff's husband worked for another architectural engineering firm that also contracted with LANL, it seems that there were legitimate grounds for concern regarding a possible conflict of interest.

Plaintiff has pointed to sufficient weaknesses and inconsistencies in the employer's proffered explanation to support a finding of pretext, however.  Plaintiff has alleged that Mr. Le-Doux, in discussing the matter with Mr. Todd, depicted Plaintiff as having in taken part in breaches of ethics more serious than writing a memorandum to LANL requesting information about Fluor-Daniel.  In his deposition, Mr. Todd recalled Mr. Le-Doux stating that Plaintiff was attempting to cause Fluor-Daniel to lose its contract with LANL, so that her husband's firm might be able to receive a contract.  Mr. Todd has testified that if Plaintiff's memo "was all that took place, I would not have asked for  conflict of interest letter, because this is merely a request for information."[8]  (Pl. Ex. 39 at 121).  Plaintiff has raised a question of fact about whether the tone and severity of the warning letter stemmed from alleged misrepresentations that Mr. Le-Doux had made about Plaintiff's conduct.  Summary judgment on this claim is therefore inappropriate.

At the pretrial conference on July 20, 2000, Plaintiff stated that one of the independent acts of retaliation she was claiming was Defendant's failure to select Plaintiff for the position of permanent Team Leader.  Defendant acknowledged at the conference that Plaintiff's non-selection

---

[8]      Defendant argues that the additional factor that encouraged Mr. Todd to tell Mr. Le-Doux to write the conflict of interest letter was that Plaintiff's husband and his boss had a meeting with Mr. Le-Doux on June 13, 1997 during which the parties discussed a LANL project that Plaintiff's husband's firm was trying to obtain or retain.  However, in the context of Mr. Todd's deposition testimony, it seem that Mr. Todd recalls Mr. Le-Doux discussing conduct in which Plaintiff herself had engaged.  Plaintiff has at least pointed to disputes of material fact on this issue.

as permanent Team Leader would constitute an adverse employment action.  As Defendant argued, however, Plaintiff's Complaint does not seem to explicitly allege that Defendant's failure to select Plaintiff as the team leader was an instance of retaliation.  Rather, part (d) of paragraph 10, in which Plaintiff lists the alleged acts of retaliation, states "Mr. Le-Doux wrongfully refused to permit Mr. Daugherty an equal opportunity to serve as Acting Team Leader (a position given to a man) which adversely affected her when the permanent position was competed.  Mr. Le-Doux was on the selection team that awarded the position to a male."  (Complaint, ¶ 10(d).)

The phrasing of this sentence places emphasis on the selection process for Acting Team Leader.  Plaintiff concedes that her non-selection as Acting Team Leader, which took place in October, 1996, could not amount to retaliatory discrimination, because she had not yet engaged in protected activity at that time.  However, it appears that Plaintiff intended to argue that Defendant's failure to appoint Plaintiff permanent Team Leader was retaliatory.  This Court will deem Plaintiff's claim of retaliation based on the permanent team leader position to be alleged in the Complaint, even though Plaintiff failed to make this claim clear.

In light of this analysis, this Court finds that Defendant's motion for summary judgment on Plaintiff's retaliation claims should be:  1) granted as to Plaintiff's allegations about Mr. Le-Doux's conduct in arranging and participating in Plaintiff's 360 degree evaluation;  2) denied as to Plaintiff's allegations regarding the issuance of the Conflict of Interest letter; and 3) granted as to Plaintiff's allegations about her non-selection as Acting Team Leader.

> 2.   Discrimination

Defendant's motion for summary judgment addresses not only Plaintiff's claims of retaliation, but also her claims of disparate impact discrimination.  Plaintiff contends that Mr. Le-

Doux discriminated against her by not permitting her to hold the position of Acting Team Leader, when she requested the position in October 1996.  In his motion for summary judgment, Defendant argues that Plaintiff is barred from bringing this claim because she did not complain of the alleged discrimination to an EEO counselor until April 1997.  Defendant cites 29 C.F.R. § 1614.105 to show that regulations require employees to make such complaints within 45 days.[9] Further, the declaration of Yolanda Scarito, an EEO and Diversity Program Manager, indicates that Plaintiff's claim of discrimination based on the failure to be appointed Acting Team Leader was dismissed for untimeliness (Def.'s Ex. R).

As she points out, however, Plaintiff did file an EEO complaint, on September 15, 1997, when another employee was chosen for the *permanent* Team Leader position.  (Pl.'s Ex. 20).  Mr. Le-Doux has acknowledged that candidates' experience as Acting Team Leader may have affected their chances for selection as permanent Team Leader (Depo. of Herman Le-Doux at 241-42, Pl.'s Ex. 2).  Plaintiff argues that even if her claim based on the Acting Team Leader decision might otherwise be time-barred, it should be allowed under a continuing violation theory. As Defendant responds, however, Plaintiff has not made a showing of the circumstances required for the equitable protection of the continuing violation analysis–  that a reasonable person would not have been alerted to assert her rights when the initial violation took place.  *See*, e.g., *Martin v. Nannie and the Newborns, Inc.* 3 F.3d 1410 (10th Cir. 1993).  Therefore, Mr. Le-Doux's denial of Plaintiff's request to serve as Acting Team Leader cannot form the basis for a distinct discrimination claim.

---

[9]     Plaintiff refers to a 300-day period in which to raise complaints, but does not cite a specific provision of 29 C.F.R. § 1614 that states this.  Defendant's interpretation of the regulation appears correct.

The evidence of the denial of the temporary position may be relevant to the factual question of whether Mr. Le-Doux had a discriminatory motive in later denying Plaintiff the position of permanent Team Leader.  As previously noted, the Complaint does not explicitly raise a discrimination claim on the basis of Plaintiff's non-selection as permanent team leader. However, this Court will deem this discrimination claim to be alleged in the Complaint.

Among the allegations in Plaintiff's Complaint is also the assertion that Mr. Le-Doux's failure to support Plaintiff her in her complaints against Ross Garcia, a LANL employee, constituted discrimination.  Plaintiff maintains that Mr. Garcia refused to provide her with certain information that she had requested in her capacity as project manager.  Plaintiff suspected that she was being discriminated against on the basis of sex, and she reported her suspicions to Mr. Le-Doux.  Mr. Le-Doux held a meeting on October 16, 1997 to address the issue.  During the meeting, Mr. Le-Doux asked Mr. Garcia if the problem was Plaintiff's personality.  Mr. Le-Doux seemed to accept Mr. Garcia's explanation that a central reason why information had not been provided to the Plaintiff was her abrasive style.

In order to establish a prima facie case of sex discrimination under Title VII, Plaintiff must point to "circumstances which give rise to an inference of unlawful discrimination."  *Burdine*, 450 U.S. at 253.  One method of establishing these circumstances would be to for Plaintiff to show that Mr. Le-Doux treated similarly-situated male employees differently than he treated Plaintiff. *See Horizon/CMS Healthcare* at 1195 fn 6.  Defendant has shown, though, that Mr. Le-Doux also sometimes refused to support Plaintiff's male coworkers when they encountered problems with LANL employees.  Mr. Murnane has testified that he experienced frustration over DOE management's failure to provide support in problems with LANL.  (Deft's Exh. J, Deposition of

25

Chris Murnane, pp. 69-70).[10]

    Plaintiff contends that Mr. Garcia stated during the meeting that he would have provided

the requested information to Juan Griego, a male employee.  Even in Plaintiff's recounting of the

meeting, however, the context of this statement seems to be that Mr. Garcia perceived Mr. Griego

to be less aggressive than Plaintiff.  This Court finds that Plaintiff has failed to establish that Mr.

Le-Doux treated similarly-situated male employees differently, in terms of the support offered in

interactions with LANL, and that Plaintiff has otherwise failed to establish circumstances that give

rise to an inference of discrimination with regard to this alleged employment act.

    Given this Court's analysis, Defendant's motion for summary judgment as to Plaintiff's

sex discrimination claims is granted to the extent that Plaintiff may not base a distinct claim of

discrimination on Plaintiff's non-selection as Acting Team Leader.  Defendant's motion is also

granted in that Plaintiff may not use Mr. Le-Doux's failure to support Plaintiff during the October

1997 meeting as a basis for a discrimination claim.[11]

─────────────────

    [10]     Plaintiff argues that Mr. Le-Doux's failure to support her differed from his failure
to support Mr. Murnane, because Mr. Le-Doux's minimization of her complaints took place in
front of LANL employees.  However, this does not seem to be such a qualitative difference in
treatment that it would support an inference of discrimination.

    [11]     In her Response, Plaintiff seems to contend that three of the employment decisions
alleged to be retaliatory in the Complaint– the Conflict of Interest Letter, the lowering of the
SOAR award, and Mr. Le-Doux's conduct with respect to Plaintiff's 360 degree evaluation– also
constitute bases for sex discrimination claims.  At the pretrial conference, Plaintiff indicated that
she did not plan to use the Conflict of Interest Letter or the award reduction to support distinct
discrimination claims.  (Transcript of Pretrial Conference, June 20, 2000, at 27-28 and 41-42).  As
for the 360 degree evaluation claim, given this Court's finding above that Plaintiff has failed to
show that her evaluation was even unfavorable, this Court does not believe that Plaintiff can use
this evaluation to support an independent claim of sex discrimination under Title VII, which
would require her to show that she was discriminated against  in the terms and conditions of her
employment.  42 U.S.C. § 2000e, *et seq.*

IT IS THEREFORE ORDERED THAT:

1)      Defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No. 39) (Five-Day Suspension) is DENIED.

2)      Defendant's Motion for Partial Dismissal Pursuant to Fed R. Civ. P. 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No. 37) (Other Employment Decisions) is GRANTED in the following respects:

a)      As to Plaintiff's claim that Mr. Le-Doux engaged in retaliatory discrimination by changing the composition of Plaintiff's 300 degree evaluation team and by giving her low scores in his evaluation.

b)      As to Plaintiff's claim that Mr. Le-Doux's failure to allow Plaintiff to serve as Acting Team Leader constituted retaliatory discrimination.

c)      As to Plaintiff's sex discrimination claim based on Mr. Le-Doux's failure to allow Plaintiff to serve as Acting Team Leader.

d)      As to Plaintiff's claim that Mr. Le-Doux's lack of support for Plaintiff during the October, 1997 meeting with LANL employees amounted to sex discrimination.

3)      Defendant's Motion for Partial Dismissal Pursuant to Fed R. Civ. P. 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) (Doc. No. 37) (Other Employment Decisions) is DENIED as to Plaintiff's claim that the issuance of the Conflict of Interest letter was retaliatory.

4)      Plaintiff's Motion to Modify Order Regarding Adverse Employment Acts Claimed by Plaintiff (Doc. No. 61) is GRANTED in part, consistent with this Court's ruling that the issuance of the Conflict of Interest letter may form the basis of a retaliation claim.

27

5)      Based on this Order and prior rulings, the following are the claims of retaliation that remain for trial:

a)      The issuance of a Conflict of Interest letter to Plaintiff in July 1997.

b)      Plaintiff's failure to be selected for the position of permanent Team Leader, in or around August 1997.

c)      Plaintiff's five-day suspension in March 1998.

6)      Based on this Order and prior rulings, the following are the claims of sex discrimination that remain for trial:

a)      Plaintiff's failure to be selected permanent Team Leader in August 1997.

b)      Plaintiff's five-day suspension in March 1998.

_____
CHIEF UNITED STATES DISTRICT JUDGE

28